Orlando **CEPEDA**, Appellant,

v.

**COWLES MAGAZINES AND BROAD-
CASTING, INC.**, a corporation,
Appellee.

**No. 18862.**

United States Court of Appeals
Ninth Circuit.

Feb. 27, 1964.

Rehearing Denied April 3, 1964.

Chambers, Circuit Judge, dissented in part.

Lewis & Stein, and Marvin Lewis, San Francisco, Cal., for appellant.

Cooper, White & Cooper, Sheldon G. Cooper, Charles W. Kenady, J. Raymond Healy and Eugene J. McDonald, San Francisco, Cal., for appellee.

Before CHAMBERS and JERTBERG, Circuit Judges, and MADDEN, Judge of the Court of Claims.

MADDEN, Judge.

This suit for libel was brought by Orlando Cepeda against Cowles Magazines and Broadcasting, Inc., because of an article about Cepeda published in the defendant's weekly magazine, Look, in its May 21, 1963, issue. The author of the article is described by the appellee, hereinafter called the defendant, as "a nationally recognized sportswriter and baseball authority." The suit was filed

by the plaintiff in the Superior Court of the State of California, in San Francisco, and was removed, at the instance of the defendant, on the ground of diversity of citizenship, to the United States District Court for the Northern District of California, Southern Division. That court granted the defendant's motion for a summary judgment apparently on the ground that the language used in the defendant's article was not libelous *per se*, since the court stated that the plaintiff had stipulated that he would not amend his complaint to allege special damages.

Cepeda had been, during the 1962 season, a member of the San Francisco Giants baseball team which had won the National League pennant in that year and had lost the World Series to the New York Yankees in a seven-game series. He was one of the ablest and best known players on the San Francisco team. He was a member of the San Francisco team again in 1963, at the time, early in the 1963 baseball season, when the article here involved was published by the defendant.

■ The article said that Cepeda's name had a sale tag on it; that "it is astonishing that Cepeda, power hitter and slick fielder on a pennant winner, should be considered expendable"; that he had "for sometime been in disfavor with owner Horace Stoneham, Manager Alvin Dark and the club's cue takers"; that among the counts against him were "(2) He is not a team man. (3) When things go wrong he blames everybody but Orlando. (4) He does not rebound and take it out on the opposition"; that he has a "doghouse status" with the Giants' hierarchy which deem him "temperamental, uncooperative and underproductive"; that one Giant executive had said, in regard to the Giants' first visit to their former New York playing field to play the New York Mets and the thunderous reception there given Cepeda's teammate Willie Mays:

"Orlando didn't get over that for quite a while. It helped pave the way for what happened to him in the second half of the season."

The fact was that Cepeda's play in the second half of that season was below his standard of the first half. In connection with the article was a photograph of Cepeda being banned by the umpire from a game because he had made a violent gesture of dissatisfaction at being called out at first base.

Section 45 of the Civil Code of California defines libel as

"a false and unprivileged publication by writing, printing, picture, effigy or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

To write of a well-known baseball player who, in the course of a season, would be under the interested observation of hundreds of fellow players and hundreds of thousands of paying customers and of the management establishments of all of the teams in the two big leagues, that this player in spite of great ability as a player has a "doghouse status" with the management hierarchy of his own pennant-winning team, which regards him as "not a team man," who blames everyone but himself when things go wrong, who is "temperamental, uncooperative and underproductive" as a member of the team, who has been characterized by at least one executive of his team as being so consumed with jealousy of one of his teammates that his ability as a player was adversely affected for half of a baseball season, would, for those who read and believed the writing, tend to produce the effects defined in the Civil Code. These statements would produce feelings of contempt and ridicule for one who, because of these faults of temperament, failed to fulfill the promise of his great natural physical abilities. They would tend to injure Cepeda in his occupation of a notable baseball player because they would put the managements of the other nineteen teams in the big leagues on notice that if they acquired Cepeda they

would get not only the asset of his great ability as a player but also the troublesome and disrupting liability of his temperament. Naturally, they would discount his value accordingly.

The Civil Code of California, § 45a, says in part:

> "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. * * *"

The defendant urges that the district court was right in holding that the defendant's article was not libelous on its face. In the case of MacLeod v. Tribune Publishing Co., Inc., 52 Cal.2d 536, 548, 343 P.2d 36, the Supreme Court of California recounted the judicial and legislative history leading to the enactment of § 45a. Applying § 45a to our instant case, and paraphrasing the language of the Supreme Court of California in the case of Maidman v. Jewish Publications Inc., 54 Cal.2d 643, 649, 7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439 we would say, "The article in question could not have any effect other than to cause injury to the reputation of a person in Cepeda's position." It was, if false and unprivileged, libelous on its face, i. e. *per se*, and there was no necessity for any allegation or proof of special damages resulting from it.

The defendant also urges that its article was privileged. A significant feature of the defendant's writing was that, though the author is said by the defendant to be "a nationally recognized sportswriter and baseball authority," the parts of the article in question of which the plaintiff complains contain practically nothing of this authority's opinion or criticism. What it gives the reader is a report of what, the writer says, Cepeda's employers, the management of the San Francisco Giants, were thinking and saying about him. Some of the thoughts were expressly attributed to that source, and the rest of them would be attributed by a reader to that source, since the writer of the article could not have known them except by learning them, directly or indirectly, from that source. We do not, then, have a situation in which the interested but relatively unsophisticated baseball buffs among Look Magazine's millions of readers were being enlightened by a nationally recognized authority's analysis and opinion of *l'affaire Cepeda*. If the article was a true report, the reader still got only what an eavesdropper with an acute ear and an accurate memory might have learned by listening at the keyhole of the Giants' front office. There are obvious difficulties about fitting this kind of writing into the philosophy upon which the privilege of fair comment is based.

The plaintiff says that the Giants' officials did not entertain the unfavorable opinions which the defendant's writer attributed to them. Since one may not escape liability for defamation by showing that he was merely repeating defamatory language used by another person,[1] *a fortiori* he may not escape by falsely attributing to others the ideas to which he gives expression. The attribution to others may well make the defamation more serious. If, for example, a sportswriter quoted Joe Di Maggio as having said that Cepeda, in the batter's box was a helpless clown, that attributed opinion would carry more weight and be more damaging than a similar opinion of the sportswriter himself. Attribution of the opinion that Cepeda's temperament was unsuited to championship baseball, to the Giants' management, the ones in a position to know most about his temperament, would, similarly, add to the weight of the opinion.

The defendant relies heavily upon the California code provision relating to qualified privilege. Section 47(3) of the Civil Code says:

> "A privileged publication or broadcast is one made—
>
> *    *    *    *    *    *

---

1. I Harper and James, The Law of Torts, § 5.18, p. 402; Restatement, Torts, Vol. 3, §§ 578, 581.

"In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or * * *.

The qualified privilege invoked by the defendant is the privilege of fair comment and criticism. This is a generally recognized privilege. There is, however, a diversity of opinion in the various state courts as to whether this privilege covers not only fair comment or criticism concerning proved or admitted facts, but also misstatements of facts to which the comment or criticism is related. Professor Prosser, in his text on Torts, 2d ed., p. 621, says that three-fourths of the states hold that the qualified privilege on account of public interest does not extend to any false assertion of fact.[2] But he cites the case of Snively v. Record Publishing Co., 185 Cal. 565, 198 P. 1, as taking the contrary view. The Snively case involved a publication in a local newspaper of a cartoon with writings inserted which imputed criminal dishonesty to the local chief of police. The court stressed the interest of the newspaper and its readers in the conduct of local officials, and the necessity of free speaking and publishing on those matters without fear of actions for defamation. In the case of Maher v. Devlin, 203 Cal. 270, 263 P. 812, the alleged libel was a charge of mismanagement of public funds. The court held, as Snively had held, that the qualified privilege granted by subdivision (3) of § 47 of the Civil Code extended to non-malicious untrue statements of facts as well as to criticism and opinion. In the case of Freeman v. Mills, 97 Cal.App.2d 161, 217 P.2d 687, the District Court of Appeal of California, Second District, held that a publication in letters between members of a race course investigation bureau relating to the conduct of the plaintiff as a race

course starter was a communication between interested persons and was qualifiedly privileged, even though false, in the absence of malice. The court cited Snively. In Larrick v. Gilloon, 176 Cal. App.2d 408, 417, 1 Cal.Rptr. 360, a case involving statements about public officers, the court recognized the Snively doctrine, though it did not cite Snively. In MacLeod v. Tribune Publishing Co., 52 Cal.2d 536, 552, 343 P.2d 36, a case of a newspaper attack upon a candidate for public office, the Supreme Court of California held that Civil Code § 47(3) and the Snively doctrine did not extend a qualified privilege to a statement published with knowledge of its falsity or without an honest belief in its truth. The court cited Prosser, Torts, 2d ed. p. 628, and Restatement, Torts, § 601.

In the case of Morris v. National Federation of the Blind, 192 Cal.App.2d 162, 165, 13 Cal.Rptr. 336, the California District Court of Appeal, First District, held section 47(3) of the Civil Code of California did not give a qualified privilege to the publication, in a national magazine of general circulation, of a characterization of the plaintiff as a racketeer who made misrepresentations to the public concerning his sale of products manufactured by blind and handicapped persons. The court said that the publication was not to a limited group whose interest warranted the disclosure to them.

If we regarded the defendant's article as presenting a genuine problem of qualified privilege, we would be uncertain as to whether the California doctrine of regarding misstatement of facts in writing or speaking about candidates for office or office holders or between persons in the relation of mutually interested parties, as Freeman v. Mills, the race track starter case, as privileged, would be applied by its courts to actors and artists and distinguished athletes, or would extend to so widely distributed

2. Acc. Harper and James, the Law of Torts. In Golden North Airways v. Tanana Publishing Co., CA 9, 218 F.2d 612, 613, at pp. 627 and 630, 15 Alaska 303 there is mention of the problem. That case did not involve the law of California.

a publication as that of the defendant's magazine. A prominent member of a distinguished team, like Cepeda of the San Francisco Giants, has a wide, almost national audience, for his performances and that wide audience would have an interest in the comments and criticisms of a nationally recognized sportswriter and baseball authority about Cepeda's performance. A public interest might be served by allowing to such a writer not only great freedom in comment and criticism but some leeway in his factual statements. However, as we have indicated earlier in this opinion, the defendant's writer did not purport to give his readers the benefit of his analysis and comment on either Cepeda's baseball performance or his baseball temperament. He was merely passing on to his readers what he purported to have learned from other persons. We do not see how a public policy in favor of fair comment is relevant or could generate a privilege in this unusual type of situation.

The district court was in error in rendering summary judgment for the defendant, and its judgment is reversed.

CHAMBERS, Circuit Judge, concurring and dissenting:

In my view, the summary judgment should be reversed and the case should go to the jury only on the following single sentence: "When things go wrong, he [Orlando Cepeda] blames everybody but Orlando." That is a statement of fact which accuses Cepeda of being a trouble maker. It is not a comment on his art. On this point, I believe the publisher should be put to his proof, and naturally the whole article should come into evidence to show the context in which it was written.

Other than as above indicated, I dissent. To make my point, I feel that I must set forth in an appendix the entire article (less pictures) with the portions of which he complains italicized.

It seems to me that on the whole the article is a lot of piffle. Counsel for appellee characterizes it as a "think piece."

I have trouble finding much thought in it.

I have lived long enough to believe that the principal problem which the article created was not one for Cepeda, but was one for owner Stoneham and manager Dark. After the publication they must have had a great many players on their team who were quite envious of Orlando Cepeda because of the publicity which Cepeda had obtained in Look Magazine.

I do not believe that the libel law of California obligates us to police the general run of sportswriters' fantasy and "horsefeathers," of which the subject article is a part. I do not think the trial court is obligated to probe what Horace Stoneham and Alvin Dark are thinking or to find out whether Cepeda is or is not in the doghouse. I do think perhaps we do have a possible Little League libel here in the single statement which I have quoted above.

Normally, we should not comment on damage at this juncture, but I do think that possibly the thing that may have led the trial judge to overlook the single statement of: "When things go wrong, he blames everybody but Orlando," is the wholly out-of-reason prayer for damages in the amount of one million dollars. In my view, there is a good argument that no possible damage of $10,000, our jurisdictional minimum in diversity suits, could be sustained and that the case, therefore, should be sent back to the state courts.

APPENDIX

Look's article of May 21, 1963. (Portions asserted to be libel are italicized.)

### ORLANDO CEPEDA
Can he slug his way out of the doghouse?
*By Tim Cohane*
*Sports Editor of Look*

*ORLANDO CEPEDA. The name seems to need a Don in front of it or a cigar band around it. Instead, it wears the sale tag: "First-class first baseman, San Francisco Giants, tradable for top-notch pitcher and other considerations."*

Until the trading deadline—midnight, June 15—a National League team may decide it can better itself by giving the Giants all they want for Cepeda. The possibility is scant. Nevertheless, it is astonishing that Cepeda, power hitter and slick fielder on a pennant winner, should be considered expendable. And expendable he has been since the end of last season.

The big fellow, whom they call "Chico" and "The Baby Bull," has for some time been in disfavor with owner Horace Stoneham, Manager Alvin Dark and the club's cue takers. The counts against him:

1) He doesn't produce the crucial hit often enough. 2) He is not a team man. 3) When things go wrong, he blames everybody but Orlando. 4) He does not rebound and take it out on the opposition. 5) He is a hardy holdout every year.

A hot and loud bat can drown out the strains of discord, and Cepeda may slug his way back to grace. Or the active bat might impress Stoneham principally as a boost to Orlando's market value. For Cepeda's doghouse status traces less to unfavorable interpretation of his batting statistics than to his overall performance, which Stoneham and the rest of the Giants' hierarchy deem temperamental, uncooperative and underproductive.

Unlike most owners, Horace Stoneham is a substantially knowledgeable baseball man. His has been the decisive voice in Giant trades that have yielded high returns. His record in dealing with managers, players and other employees bespeaks a patience and loyalty uncommon among magnates. But when one or a combination of reasons finally turns him against a man, Stoneham can be as unshakable as old Coogan's Bluff.

Evidence of front-office disenchantment with Cepeda has been piling up ever since the Giants' near miss in last October's seven-game World Series with the New York Yankees. From November 21 through December 15, when interleague trades without intraleague waivers were permissible, the Giants talked with American League teams about Orlando.

"We would dearly have loved to have him," says one executive in the American League. "Trouble is, to get him we would have had to give them most of our ball club."

"Cepeda," reports another, "was available to any American League club willing and able to give up the big pitcher and a few other things, say a minor-league player valued at $100,000. Nobody felt they could afford to give up the pitcher without weakening themselves."

After the interleague deadline, the Giants turned to National League clubs, but the same roadblocks barred action. So the prospects of making a suitable deal for Cepeda are not good. In baseball, however, situations change rapidly. The falloff of a star or the sudden rise of a youngster can almost overnight transform a team's trading approach.

Although trade talks involving Cepeda were unpublicized, his soured situation with the Giants was emphasized when they sent him his contract. In 1962, his salary was estimated at $46,500, a $16,500 increase over 1961, when he knocked in 142 runs, hit 46 home runs and averaged .311. The Giants went on to win the 1962 pennant and make a strong World Series showing. Under such conditions, raises for all are customary. But the club asked Cepeda to take a cut, reportedly deep, then offered him the same salary as in 1962. Orlando balked.

Finally, unable to make a deal, the Giants took themselves off a somewhat awkward hook by granting Cepeda a token raise of $1,000. Orlando, having won a point of pride, predicted that if he had as good a season in 1963 as in 1961, Stoneham would have to do handsomely by him.

Manager Alvin Dark rates his players by a plus-and-minus system. "Our players get a plus anytime they do a little extra to help win a game. Anytime a player misses a sign or fails to drive in a runner from third with less than two out, in a key spot, he's charged with a

minus." Single pluses are given for good effort—homers, sacrifices, squeeze plays, key hits, good fielding plays—in the early going. Extra pluses are awarded for late-inning performance that helps to tie or win a game.

Shortly before Cepeda signed, Dark revealed that, by this system, Willie Mays, the brilliant center fielder, and third baseman Jimmy Davenport, rated one-two in 1961 and 1962. Despite a 1962 record of 35 homers, 114 runs-batted-in and a .306 average, Cepeda was, in Dark's words, "terribly minus." Pressed on this, Dark said, "I'm answering because you asked, but Cepeda had 40 more minuses than pluses. A terrible record," he added, "especially for the last half of the season."

"I don't know what Dark is talking about in the plus and minus business," said Cepeda. "What about the first half of the season? My record speaks for itself."

Orlando's opinion is not the organization's. The Giants had to make a tearing stretch run to tie the Dodgers in the regular season. They had to do it again to win the playoff, two out of three. *The Giants feel that if Cepeda hadn't failed to make the big hit so often, their job would have been far easier. They also feel that the failure of Orlando's bat to bang, except in the sixth game, cost them the World Series.*

Dark, as a shortstop on championship Boston Braves and New York Giants teams in the 40's and 50's, was a completely selfless, dedicated competitor. And he expects dedication. By a fine here and a statement, direct or oblique, there, he intimated during both the 1961 and 1962 seasons that Cepeda did not help the team as much as he should have. After Dark's predecessor, Bill Rigney, took over the Los Angeles Angels in 1961, he stated that he never had been able to make a team player out of "The Baby Bull."

*The atmosphere that has consequently developed suggests that if Orlando ever does fulfill his potential, it will be for* another team. *The Giants may well believe this, which perhaps explains their effort to deal him into the American League.*

Indispensable to an understanding of the Cepeda controversy is Willie Mays. When the Giants moved from New York to San Francisco in 1958, Mays was a long-established superstar; Cepeda, a rookie of resplendent possibilities, but untried. Mays had made his reputation, however, in New York, where some writers were so bold as to compare him as an all-around center fielder with Joe DiMaggio, a San Francisco product. So fans extended Mays a cool hand, looked around for a No. 1 hero uncontaminated by the Polo Grounds and installed the heralded Cepeda.

Cepeda strengthened his position with a fast start. Mays, meanwhile, felt strange in the new city, sensed his tepid reception and was harried by personal problems. Even when he hit .347 that first year in Seals Stadium (Candlestick Park was not ready until 1960), Willie was not himself. In 1961, strangeness and personal problems behind him, he began to play like the old Mays. His magnificent contributions, especially in the crises, to the 1962 pennant, San Francisco's first in the big leagues, finally won him full, warm acceptance.

Meanwhile, Cepeda's five-year performance was far from a flop. Totals covering 1958 through '62 reveal him a definite but respectable second to Willie in all batting departments: hits, 943–922; doubles, 173–163; triples, 36–16; home runs, 181–157; runs, 612–471; runs-batted-in, 567–553; runs produced (runs plus runs-batted-in, minus home runs), 998–867; total bases, 1,731–1,588; slugging percentage, .584–.532; batting average, .318–.309; stolen bases, 119–75. These figures suggest that though Cepeda is no Mays and may never be, he remains an exceptionally strong offensive factor.

*Statistics or no, Cepeda probably did not realize that Mays, and not he, really was the big man on the Giants—until the team made its first visit to its old New York home, the Polo Grounds, to meet the*

new tenants, Casey Stengel's Mets. Like all of the Giants, Cepeda was received warmly, but his welcome was placid compared to the thunder reserved for Mays. Says one Giant executive, "Orlando didn't get over that for quite a while. It helped pave the way for what happened to him in the second half of the season."

While Cepeda concededly poses the Giants a personality problem, baseball is full of personality problems, and several points can be itemized in Orlando's defense.

Ever since Pedro Zorrilla discovered the boy on the Santurce, Puerto Rico, team in the early 50's and recommended him to the Giants, Cepeda has been burdened by an all but crushing buildup. After his first season in San Francisco, he evoked over-enthusiastic comparisons with Jimmy Foxx, Rogers Hornsby, Josh Gibson (king of Negro hitters and catchers in the era before organized baseball admitted the colored player) and his own father, Pedro Cepeda, who rivaled Gibson as a hitter.

As a fielder, Orlando is a first baseman strictly. He handles the glove well, especially on the throw into the runner, ranges recklessly for foul flies and has a good arm. As a base runner, he is swift for his size, but unstable. From 1959, through 1961, he was often played in the outfield, where he was very average, and even for a few games at third base, where he was a sideshow. He was not happy about the juggling, but had to go along. The shifts were engineered to make room at first base for Willie McCovey, who in 1962 more or less settled in the outfield. McCovey's sometimes authoritative bat would give the Giants some first-base protection, if they traded Cepeda.

Cepeda's biggest handicap has been too much baseball. For about eight years, he played around the calendar, in the States and in Puerto Rico, where he is a national hero. Orlando is young and ox-strong, but the schedule wore him down.

Physical weariness contributed to his batting falloff in the second half of last season. He stands well back in the box, away from the plate, like Hornsby, and strides into the ball. When he is tired, his form becomes disarranged, and he ends up with a disproportionate number of pop-ups and strikeouts, especially when he tries to overpower the outside pitch.

At the Giants' request Cepeda did not play in Puerto Rico last winter. He did some gymnasium work and reported for spring training at 227, seven pounds over his normal playing weight. The Giants believe he would be more effective at 210 to 215, especially if he can melt the pounds off his hips and butt. Whatever his weight, he should benefit from the winter's rest.

It is not imperative that Cepeda mature sufficiently to approximate a team player. He could remain primarily the virtuoso of the long ball and still be as productive as the Giants think he should be. When he first came up, his counselor was Tom Sheehan. This veteran Giant scout and troubleshooter (and manager during part of the 1960 season) is known as "The Great White Father of the Carribbean," because of the many players he discovered in that area. Sheehan's advice to Orlando is as sound today as it was when first given: "If you keep a level head and concentrate on the game, you will be a great player."

Note: The following "cutlines" appear opposite pictures of Cepeda:

1. When Cepeda joined the Giants in 1958, he was hailed as the finest prospect in baseball. Since then, his five-year record by ordinary standards has been impressive. Some baseball men believe, however, that the big first baseman has not reached his potential and that he never will with the Giants.

2. Cepeda thought he had made first base safely. When he heard that the umpire thought otherwise, he wheeled, grabbed his batting helmet, and slammed it to the ground. For this, he was thumbed out of the game, and, left, is being led away.

3. Heavy back and shoulder muscles account for Cepeda's extraordinary slugging power. The man in the dark glasses, talking with Orlando, is the veteran secretary and landmark of the Giants, Eddie Brannick.