

**Decided  May  23,  1980**

46

47

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

JOSE C. TENORIO, dba ) CIVIL ACTION NO. 78-019
J. C. TENORIO ENTERPRISES, )
                           )
           Plaintiff,      )
                           )
    vs.                    ) FINDINGS OF FACT;
                           ) DISCUSSION;
VICENTE N. SANTOS,         ) CONCLUSIONS OF LAW
                           )
           Defendant.      )
_____)

By virtue of the First and Fourteenth Amendments to the Constitution of the United States, made applicable within the Northern Mariana Islands pursuant to Section 501(a) of Article V of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, the Commonwealth shall not make or enforce any law "abridging the freedom of speech..." The issues presented in this case bring into focus the construction of those Amendments in the context of causes of action for defamation which by allegation occurred during speeches made by the plaintiff and defendant-counterclaimant during the Commonwealth gubernatorial and senate campaigns of 1977.

The aforesaid cause came on for trial before the Court sitting without a jury on the fourteenth day of November 1979; Mr. John Moore appeared as counsel for the plaintiff and Mr. Douglas Cushnie for the defendant.

Having reviewed the testimony of the witnessés and the exhibits received into evidence at trial and all memoranda submitted in advance thereof and the post-trial briefs duly submitted by counsel, and now being fully advised in the premises, the Court herewith makes and enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiff Jose C. Tenorio, also known as "Joeten," is a merchant and businessman and a life-long resident (56 years) of Saipan. He and his wife started in the retail store business in 1949. Among the various enterprises in which he has been and/or is presently involved as a businessman are Joeten Shopping Center (referred to by plaintiff as "the store"), Saipan Shipping Company (a.k.a. "Saiship"), Saipan Distributing Company, a bus company, Micro Construction Company, Coca-Cola of Micronesia, Marianas Corporation, a bowling center, and a low-income family housing project. At the time of trial, plaintiff employed approximately 450 persons. Prior to his unsuccessful campaign for governor in 1977, he had run for political office once, for the Municipal Party sometime during the 1940's.

2. Defendant Vicente N. Santos, also known as "Ben Santos," is a resident of San Vicente Village, Saipan, and is currently employed in the Program for Legislative Affairs, Government of the Northern Mariana Islands. He served for several years as the president of the former Marianas District Legislature, and before that he was vice-speaker of the Municipal Council on Saipan. In 1977 he ran unsuccessfully for the Northern Marianas Senate.

3. On the evening of November 16, 1977, the plaintiff, while campaigning in San Vicente Village, gave a speech which

made several references to the defendant. The statements made by the plaintiff in reference to the defendant, spoken in the Chamorro language, were translated into English at trial and included, either verbatim or in import, the following:

a: That the defendant had not built a church for the people of San Vicente; that he preferred to build his house before building a church for the people of San Vicente ("God in typhoon shelter, him (defendant) in palace").

b. That the people continued to make the defendant rich, and that the defendant continued to "suppress and fool" the people.

c. That the defendant was "nibbling at the food sack"; "poking at the Abuni" and feeding his family with it, and that his family was fat because he fed them the Abuni.

4. The literal definitions of "Abuni" are the "stomach," "backside" (or underside) of the coconut crab, a well-known delicacy indigenous to the Northern Mariana Islands and Guam. "Abuni" is also translated as the "balls" (testicles) of the coconut crab. The phrase "poking at the Abuni" had been uniformly translated by all witnesses except the plaintiff to mean that the defendant was stealing to feed his family. One witness testified that in addition to "stealing from someone else," the phrase could mean someone (a male person) is "shacking up with someone's wife."

5. On or about November 21-23, 1977, the plaintiff made another campaign speech in Chamorro before the public in Oleai (San Jose Village), Saipan. In this speech the plaintiff made certain statements regarding the defendant, translated into English at trial, and including the following:

50

a. That if the people voted for the defendant "he will continue to fool you," and "you made him rich -- he's got three cars."

b. That "if you continue to vote for this guy he will continue to cheat; deceive you. He cheated (a man from Tinian)[1] out of land; he owns three cars."

6. On November 29, 1977, in a public speech delivered in San Vicente, one Juan Barcinas made certain statements to the effect that the defendant cheated him in a land transaction in Tinian.

7. Sometime during the month of November, 1977, Barcinas had told the plaintiff that the defendant had cheated him on a "land deal" in 1973. Barcinas explained that he was trying to sell his property on Tinian so that he could go into business. He and the defendant agreed upon a selling price of $12,000 for Barcinas' land. At the time the transaction was closed, the defendant offered Barcinas $11,000 instead of the $12,000 which they had formerly orally agreed on. Barcinas asked why only $11,000 was being offered when they had previously agreed on $12,000. The defendant told Barcinas that the land area was only four (4) hectares, not five (5) hectares as they had previously believed it to be. Barcinas stated he believed he was cheated because they had agreed on $12,000 and the defendant only gave him $11,000 for the land. Barcinas decided to take the $11,000.

8. The defendant testified as to the land transaction as follows: On or about January 1973, while on a trip to Tinian, his friend, Mr. Manglona, suggested that he go to Barcinas for watermelon. Barcinas gave the defendant three watermelons without charge. Barcinas and his "common law" wife then asked the defendant for a $500 loan so that Barcinas could be sent to Okinawa for certain "hot treatment" therapy. The defendant

---

1. Juan Barcinas

51

stated that he had no cash but would co-sign for Barcinas. Barcinas then offered the defendant two parcels of land comprising six hectares. He stated he wanted $12,000 for the land. The defendant said he did not have the money. When the defendant later sold certain land that he had owned, he went to Barcinas to buy the parcel offered for $12,000. The defendant told Barcinas that the parcel was only 4.4 hectares, and offered (i.e. counter-offered) $11,000. They (Barcinas and his wife) accepted. The legal documents were signed on or about January 1973. The $11,000 was paid in cash to Barcinas and his wife. The defendant told them that they needed a notary public and witnesses, and that the transaction would be concluded the next morning. That night, the defendant went to a fandango. Barcinas and his wife were there, and asked the defendant for the money that evening. The defendant asked them not to mention "it" until the following day, and also that he had already contacted the mayor. The next morning Barcinas and his wife came to the defendant before Mass. Manglona arrived, and the defendant requested him to get Mayor Borja. "They" came, and the money was counted. Barcinas was trembling when he received the cash. Barcinas and his wife "grumbled" how they had been cheated by "land mangement"; that there should have been six, and not 4.4 hectares. The defendant said it was not his problem.

9. Sometime during 1973 the defendant was sued in a civil action instituted by the Trust Territory Government on a cause of action based on misappropriation of public funds. The cause of action arose out of alleged overtime payments in the amount of $35,000 that the defendant kept for himself while working as a full-time employee of the legislature. In 1978 the defendant returned $8,850 in settlement of the claim against him and the action was subsequently dismissed. An article in the February 9, 1973 edition of the Marianas Variety newspaper reported the lawsuit.

52

10.  On December 7, 1977, at approximately 7:00-8:00 p.m. in San Vicente Village, the defendant made a campaign speech before the public in the Chamorro language. Translated into English, and transcribed for the Court, the speech includes the following statements made by the defendant in reference to the plaintiff:

> Ladies and Gentlemen, if Joeten become(s) the
> Governor he will deceive us again in 4 years.
> We are fed up with all his deceivings (sic) in
> the past.

> *               *               *

> When he came the first to campaign, Joeten,
> the Saipan's worst thief (betrayer, cheat)
> said here in San Vicente, that if he's the
> one that win, he, Joeten, will built (sic)
> the San Vicente Church.

> *               *               *

> He also first stayed here at his ranch and his
> house is bigger --- as a matter of fact, he
> bankrupted MCC when he built his house - that
> up to now he hasn't completely pay (sic) back
> MCC.

> *               *               *

> Don't vote for Joeten because he will deceive
> you again.  He had fooled you so many times in
> the past.

> *               *               *

53

... if Joeten becomes the Governor, he will fool
us - this bad person again.  He has been cheating
us with the goods from the store.  Even if he
bought a pair of zories at 25 cents he sells
them for 20 years at 90 cents per pair.  Very
cunning on business!  If we, the poor, and
ordinary won, we will protect all of you.

*   *   *

... You, the old ones, think of Saipan Importers.
There were lots of you that had stock.  Who fooled
you?  Were you given your shares?  Who fooled the
people of Saipan?  The money that you put into
Saipan Importers Company?  This person shrewdly
fooled the people of Saipan for a long time in
business area.  Too much!  The second time that
they came, Joeten brought with him one person from
Tinian and had him talked (sic) here in San Vicente
about land matters that I bought in Tinian.  Ladies
and Gentlemen, if this gentleman said that I owed
him $1,000.00, at any time he should go to the
court and he should ask me for the money there.
But Joeten really wants this land of mine in
Tinian because its (sic) pretty to built (sic) a
hotel on it.  There is a beautiful beach in front
of this land.  And I never cheated anyone either
from Tinian or Saipan.  The first person that
raised the land price of Tinian is me!  In the
past, 5 hectares is sold as low as $5,000.00,
$3,000.00.  But when I bought mine, I bought

the 4 hectares, 4 "tambo" it went down to
$11,000.00. I was the first one, I was the
first person to raised (sic) the land price
of Tinian since I bought the land. All the
land from 5 hectares up they be bought for
as far as $10,000.00 $15,000.00 up. I'm
wishing that all of you people of Saipan,
and you people of San Vicente. If Joeten
can do these things, this hombre, that he
would take this Tinian person over here to
make him tell a lie, then he can also command
that your farms be burned. He can, also,
Joeten and Olympio ordered (sic) that your
houses be burned.

\*                    \*                    \*

... We send the governor to Washington DC to
testify and to meet with one of the most
intelligent congressmen in the whole world.
And for him to be.. he has been fooling us in
our land. He had been fooling us. He has
been mocking us. He said to your congressmen,
the congressmen for the poor, "where are we
going to get the money to paid (sic) off the
war claims." He is the one... the rascal,
Joeten, he received $9,000.00 from the war
claim. $9,000.00! And he received it and
he enjoyed it lavishly. Where did that help
come from? From the poor? From the poor and
most dedicated and from your good congressmen,
the congressmen for the poor.

\*                    \*                    \*

55

... he said that if he is the one that wins,
he will built (sic) the church. If he wants
to built, (sic) go ahead and built (sic) the Church!
He doesn't have to mention it in front of the
people. It is not only during the campaign that
you'd offered God that if he's the one that wins
he will built (sic) the church. We, the poor,
we can built (sic) the church. Little or big
and we are to honor God in little power that we
have. Not that kind of power -- the power of
deceit! and the power of cheating, and the power
of lies. That's not the kind of power - God
doesn't need that power of deceit!

\*              \*              \*

... Who is the most..who is the most betrayal (sic)
to the people of Saipan? Who cheats the people of
Saipan most? I told in the past campaign last
Sunday someone telephone me, one man. He is working
at Joeten. He was telling me that there are stolen
good (sic) from other businessmen..there is... and
this is what the kid said, "Mr. Santos, there are
stolen goods straight from the dock to the warehouse
are being sold at the store." This is for your
information because I was being told. Even those
people working there are talking about this bad
hombre.

\*              \*              \*

... If Joeten continues to talk about me, this is
not all. Because then I'll write because here I

have this information when this youngster
telephone (sic) me; I don't know his name,
who was telling me all the wrongdoings that is
going on in Joeten's business. The goods of
the people they take and sell, What does
this mean, this hombre? This is a very big
"food sack" Joeten is pouncing at! Very big
"food sack" Joeten is—pouncing at! And if we
won, we will protect all the businesses little
or big nes. And there are goods at the dock
they have to be inspected so that nobody takes
the goods of someone else's and sell them.

        *         *        *

So ladies and gentlemen, excuse me for
tonight for my language was strong but its (sic)
important that I defend myself. Its (sic) very
important that I defend myself because I will not
permit that bad person will (sic) continue to lie
to you people of San Vicente, people of Saipan.
And if he is the Governor, let me tell you; that
there will be much destruction.

        *         *        *

11. Approximately two years before trial, Micronesian
Construction Company (M.C.C.) went into receivership, or in the
testimony of the plaintiff, became "bankrupt."

12. The defendant's reputation in the community at the
time these causes of action allegedly accrued was "very good."
No evidence was submitted as to the plaintiff's reputation.
In the absence of evidence to the contrary, the Court finds
that the plaintiff did not have a bad reputation in the commu-
nity or in his business activities.

13. Both plaintiff and defendant were de facto candidates for public office at the time the campaign speeches by each were made during the 1977 Commonwealth gubernatorial and senate campaigns.

## DISCUSSION

1. The Standard of Review; Policy Considerations.

Counsel for both plaintiff and defendant-counterclaimant agree that this Court is required to determine the issues presented in this case according to the standards provided by the United States Supreme Court in New York Times v. Sullivan, 84 S.Ct. 710 (1964) and its progeny. The central rule set out in New York Times is that a public official is prohibited from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. Id. at 726. The parties herein allege that, as seekers of public office, each is a "public figure," and that the New York Times rule applies to their status as political candidates.

Whether the parties are appropriately characterized to have been "public figures" or "public officials" -- several state courts having construed, perhaps prematurely, the latter term to apply to candidates for public office -- the fact remains that it has been specifically ruled by several courts, including the Supreme Court, that the "actual malice" rule of New York Times applies with equal force to candidates for public office. St. Amant v. Thompson, 88 S.Ct. 1323 (1968) Ocala Star-Banner Co. v. Damron, 91 S.Ct. 628 (1971), Monitor Patriot Co. v. Roy, 91 S.Ct. 621 (1971). Yet beyond the status of the parties, there is the special significance of the political milieu in which the causes of action in this case arose: a new government to be elected by the people; a robust, frequently dramatic political campaign where the issues before the electorate were manifold

58

and often complex, and perhaps of greater consequence to their future than those which are generally before a people who have lived under an established government with a record of successes and failures in long-standing programs, and who therefore may be better informed through past experience to assess the political prospectus; where the personalities and concerns of the candidates could understandably lead to hyperbole and even some misstatement in their call for informed voter participation and party solidarity. In this, the first Commonwealth campaign, the tension between the right to the free dissemination and exchange of ideas and the danger of divesting the electorate of its capacity to make an informed, well-reasoned choice among the candidates was particularly pronounced. Because of this, the special constitutional considerations recognized by the Court in New York Times as necessary in the context of political expression are of heightened importance in the issues now before this Court:

> In Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213, the Court declared:

>> "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

> ... erroneous statement is inevitable in free debate, and... it must be protected if the freedoms of expression are to have the "breathing space" that they "need to survive"... (citations omitted).

> New York Times v. Sullivan, supra at 721.

59

As the Court in New York Times stated that there is a "national commitment," so this Court believes there is a commitment in the Commonwealth, "to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Id. It is thus appropriate to reiterate the policy considerations which provided the basis for the New York Times rule:

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (citation omitted)..."The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means... is a fundamental principle of our contitutional system." (citation omitted) "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," (citation omitted) and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion." (citation omitted)... The first Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." (citation omitted). Mr. Justice Brandeis, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375-376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, gave the principle its classic formulation:

>> "Those who won our independence believed... that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.

> Believing in the power of reason as applied
> through public discussion, they eschewed
> silence coerced by law -- the argument of
> force in its worst form. Recognizing the
> occasional tyrannies of governing majori-
> ties, they amended the Constitution so
> that free speech and assembly should be
> guaranteed."

Id. at 720-721.

With these policy considerations in mind, the Court in New York Times provided that proof of "actual malice" -- that is, knowledge or reckless disregard of the falsity of the defamatory statement -- is required before a public official may recover damages against one who defames him.

2. Damages; Proof.

With respect to the issue of damages, where the requirement of "actual malice" applies, the rule is that, to recover damages for allegedly defamatory criticism of conduct bearing on his official capacity, a public official, and in this case, the parties-candidate, must establish by "clear and convincing proof" that the publisher of the defamatory statement had knowledge of, or recklessly disregarded, the falsity of the defamatory statement. Rosenbloom v. Metromedia, 91 S.Ct. 1811 (1971); Ocala Star-Banner Co. v. Damron, supra. This is necessarily a subjective standard, and the Supreme Court in cases subsequent to New York Times has clearly dispelled any implication that the recklessness in defaming a public official is measurable by reference to the conduct of a reasonably prudent person. In St. Amant v. Thompson, supra at 1325, the Court stated that "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

61

While the finder-of-fact may infer from the evidence before it that the publisher of the defamatory statements did in fact entertain such doubts, the recklessness required by the New York Times rule may not be inferred from the mere combination of falsehood and the publisher's general hostility--i.e. "express malice," a concept entirely different from the constitutional privilege embodied in the term "actual malice" (see, e.g. Cantrell v. Forest City Publishing Co., 95 S.Ct. 465 (1974) -- toward the party allegedly defamed. Nor may recklessness be inferred from negligence. St. Amant v. Thompson, supra at 1325. Furthermore, the failure to investigate, standing alone, is not sufficient to satisfy the New York Times standard. Curtis Publishing Co. v. Butts, 87 S.Ct. 1975 (1967).

Thus, the resolution of the claims in this case must be considered against a background of precedent that dictates that there is a substantial burden upon each of the parties to prove that the allegedly defamatory statements in the 1977 campaign speeches were made with the publisher's knowledge that they were false or in reckless disregard of their truth or falsity.

The Court finds that the plaintiff and defendant-counter-claimant have both met this substantial burden of proof, and have proven that each had published statements which were action-able defamation.

In the instance of the anonymous phone call which allegedly was made by one of the workers from the plaintiff's store, the defendant could not have repeated the direct statement and its attendant imputation that the plaintiff was taking "stolen goods straight from the dock to the warehouse and (was selling them) at the store," except with at least reckless disregard of whether such statement was false or not. As stated in St. Amant v. Thompson, supra at 1326:

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove per-suasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anony-mous telephone call. (emphasis supplied)

As the finder-of-fact in this case, the Court is not persuaded that the defendant made the statement in good faith. Moreover, it would be no defense to the defendant's report of the anonymous phone call that he was merely stating what a third party had told him. Every repetition of the defamation is a publication in itself, even though the repeater states the source. "Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports." Goldwater v. Ginzburg, 414 F.2d 324 (2nd. Cir. 1969), cert. den. 396 U.S. 1049, 90 S.Ct. 701, citing St. Amant v. Thompson, supra. See also Prosser, Torts at 768 (4th Ed. 1971). "A defendant may not escape liability by attributing to others the ideas to which he gives expression." 50 Am. Jur. 2d , Libel and Slander, § 290 ( 1970), citing Cepeda v. Cowles Magazine & Broadcasting, Inc., 328 F.2d 869, 871 (9th Cir. 1964), cert. den. 379 U.S. 844, 13 L. Ed. 2d 50, 85 S.Ct. 51.

At trial, the defendant sought to establish through the testimony of several witnesses that certain merchandise shelved at the plaintiff's store had been obtained by illegal means. However, according to the testimony of defendant's witnesses, the testimony they offered regarding the suspicious circumstances by which such merchandise found their way to the Joeten store was never communicated to the defendant. Additionally, the testimony they offered suffered from chronological and factual inconsistency and thereby lacked the aura of credibility required to show, by a preponderance of the evidence, that the merchandise were in fact obtained illegally. The testimony of Andresina Torres Flores relating to the time she communicated her knowledge to the defendant is completely lacking in credibility.

These witnesses, therefore, were of no probative value in determining the state of mind of the defendant at the time he made his campaign speech in San Vicente.

The plaintiff's statement that the defendant "cheated" Juan Barcinas "out of land" also constituted defamation in that

63

it accused the defendant of a crime,[2] and would have necessarily affected the esteem in which the defendant was held in the community and have caused him to be held in contempt and perhaps shunned by that community. There can be no question that, as an experienced and moreover successful businessman, and further having been fully informed of the circumstances involved in the land transaction between the defendant and Barcinas,[3] the plaint knew that the defendant's counter-offer and Barcinas' acceptance of $11,000 instead of $12,000 was both legal and reasonable in light of the fact that the parties to the transaction were mutu mistaken in believing that the property consisted of 6, rather than 4.4 hectares. Indeed, a strict abatement of the purchase price to conform to the amount of land actually existent would have brought Barcinas less money that the $11,000 paid by the defendant.

In addition, the Court finds that there was mutual assent by the parties to the land transaction.

---

2. According to Section 571 of the Restatement of Torts, the crime which the plaintiff is accused of committing must be "(a) chargeable by indictment or its modern equivalent, and (b) punishable by death or imprisonment otherwise than in lieu of fine." Other definitions require imputations of crime actionable as slander per se to include those offenses involving "moral turpitude, which in turn has been susceptible to various definitions, including the "inherent baseness or vileness of principle in the human heart." See Prosser, Torts, supra at 755-766, also Annot. 52 A.L.R. 2d 1314 (1970). 11 T.T.C. § 853 (Cheating; false pretenses) and 11 T.T.C. § 855 (Receiving stolen goods) both provide for terms of imprisonment, although neither for a term beyond one year (six months maximum for cheating/false pretenses, one year maximum for receiving stolen goods.)

3. Barcinas testified that he told the plaintiff the "same" as his statements to the Court, because "we" (Barcinas and his wife) were originally going to sell the property to the plaintiff, but when the plaintiff was shown where it was, he no longer wanted it.

There is no sufficient evidence of fraud, duress, undue influence, overreaching, or other means employed by the defendant to negate the acceptance by Barcinas or the requisite mutual assent by the parties, and no other evidence that the plaintiff's statements that the defendant cheated Barcinas were otherwise founded in truth. Therefore, the Court finds that the plaintiff either knew or recklessly disregarded the falsity of his statements that the defendant cheated Barcinas out of land.

In his complaint, the plaintiff has prayed judgment against the defendant for general damanges in the sum of $75,000.00 and punitive damages in the amount of $150,000.00. As a general rule, if the case is one in which the plaintiff can recover without having to prove special damages, he is entitled to recover general damages, including, but not limited to, the mental anguish and associated economic losses that are not included under special damages. In addition, general damages are presumed to flow from certain kinds of defamation, and little in the way of proof has to be presented to support an award. Henderson & Pearson, The Torts Process, Ch: 12: Defamation at 836 (1975).

The defendant has argued at trial that the Supreme Court in Gertz v. Welch, 94 S.Ct. 2997 (1974), has abolished the common law doctrine of slander per se, which includes certain categories of slander whereby a successful plaintiff need not prove special damages for recovery from a defendant who has first been determined to be liable. The plaintiff's interpretation of Gertz is that, because the Court there stated that punitive damages are awardable upon a showing of knowing or reckless falsehood (citing Gertz v. Welch, 60 L. Ed.2d at 125), nonpublic figures are limited to an award for actual damages, while public figures may obtain punitive damages once their claim for actual damages is proven. Therefore, according to the plaintiff, in this case he "is not required to show actual damage, but his sustaining of the burden of showing actual malice entitles him to an award of punitive damages." (Plaintiff's Memorandum of Fact and Law, filed December 10, 1979, at 21).

65

The Court disagrees with both counsel in their cited interpretations of _Gertz_. In neither that case nor any other has this Court found any specific rule of law or other intimation that the common law forms of slander per se have been abrogated by or are inconsistent with the constitutional standards brought to bear on the law of defamation. While _New York Times_ and its progeny have focused on the standards of liability, the common law concept of slander per se is applicable only to proof of damages, and has nothing to do with liability. Further, it is the Court's understanding of the passages in _Gertz_ referred to in plaintiff's memorandum that they clearly do not allow an automatic award of punitive damages upon a public figure's showing of actual malice. _Gertz_ merely states that, while a nonpublic figure may recover actual damages only upon the showing of some "fault" on the part of the defendant--i.e. that the burden of proof is lesser for a private plaintiff than a public figure -- the nonpublic plaintiff may not recover punitive damages except by showing that the defamatory statements by the defendant were made with actual malice. It would be totally inconsistent with the language of _Gertz_ and the principles which created the constitutional privilege afforded public figures, not to mention plain logic, to say that although a public figure plaintiff has a greater burden than a nonpublic figure to obtain an award of actual damages, he does not have to prove anything further to recover punitive damages, while the nonpublic figure must overcome a still greater hurdle to recover punitive damages.

While punitive damages serve a wholly legitimate purpose in protection of individual reputation and to safeguard all those similarly situated against like abuse, the usual rule is that a higher degree of fault is necessary to sustain a punitive imposition than a compensatory award. _Curtis Publishing Co. v. Butts_, supra.

66

The Court therefore believes that _Gertz_, while articulating some very innovative and important constitutional considerations applicable to a private plaintiff suing a media defendant, is of relatively little consequence to the resolution of the issues in this case.

Certain categories of slander are actionable without proof of special damage. Two of those categories involve imputations (1) accusing one of crime, and (2) affecting one in his business, trade, profession or office. (See Prosser, _Torts_, _supra_ at 754-759; also _Restatement of Torts_ §§ 570-571, § 573 (1934, incl. 1974-1975 Supp.)

By publishing the anonymous phone call from the plaintiff's store, the defendant, while perhaps not accusing the plaintiff directly of stealing goods from other businessmen, made sufficient allusion to the plaintiff by prefacing those statements with the question "who cheats the people of Saipan most?" Moreover, even if the plantiff had not been directly accused of criminal conduct by the defendant's statements, or if the crimes are not those contemplated by the common law as "per se" slanderous, the accusations nevertheless imputed conduct to the plaintiff which was incompatible with the proper conduct of his business, and thus fit into the category of slander per se. _Barlow v. International Harvester Co._, 522 P. 2d 1102, 1111 (1974).

The Court does not believe that any other of the statements made by either plaintiff or defendant were actionable. It is not enough merely to suggest that another is capable of committing a crime or that he would commit it if sufficient opportunity were presented (see _Restatement of Torts_, _supra_, Comment (c) to § 571). Therefore, the statement by the defendant that "he (the plaintiff) can order that your houses be burned" does not subject the defendant to liability. Further, the context of the terms "worst

67

thief," "betrayer," "cheat," and "deceive and fool" clearly indicate that they were used in the lay rather than legal sense. The statement by the defendant that the plaintiff was "cheating with goods from the store" was meant to illustrate, together with specific examples of the difference between wholesale cost and retail prices of particular goods (e.g. zories), the markup of merchandise in the plaintiff's store. It was no more than an expression of the defendant's opinion that the retail prices at the plaintiff's store were excessively high. See Annot. 11 A.L.R. 3d 886 (1967). The defendant's manner of expression was not actionable as such. Finally, there was no evidence that the defendant's statement that the plaintiff "bankrupted M.C.C." was spoken with either knowledge or reckless disregard of falsity. An examination of the context of this statement discloses that the defendant was merely attempting to express the expense to which the plaintiff went to build his house. Additionally, the only evidence the Court has regarding M.C.C. is that two years ago it became bankrupt and went into receivership.

Much the same can be said regarding the plaintiff's statements about the defendant. "Suppress," "fool," "cheat," and "deceive," though obviously used in a pejorative sense, did not refer to any particular incident or transaction, and therefore did not rise to slander, and may best be described by the common law term "fair comment." Nor does the Court find that there was "clear and convincing proof" that the plaintiff's statements "poking at the Abuni" were spoken with actual malice. "Poking at the Abuni" was a direct reference to the 1973 civil suit brought against the defendant and reported in the Marianas Variety. The critical and necessary element of "actual malice" on the part of the plaintiff is missing.

Insofar as the above Discussion includes findings of fact or conclusions of law, it shall be deemed to be incorporated into the Findings of Fact and Conclusions of Law herein whereever appropriate.

68

1. It has been established by clear and convincing proof that the following statement by the defendant:

> ... Who is the most... who is the most betrayal (sic) to the people of Saipan? Who cheats the people of Saipan most? I told in the past campaign last Sunday someone telephone me, one man. He is working at Joeten. He was telling me that there are stolen good (sic) from other businessmen..there is... and this is what the kid said, "Mr. Santos, there are stolen goods straight from the dock to the warehouse are being sold at the store." This is for your information because I was being told. Even those people working there are talking about this bad hombre...

was defamatory; was published to third persons and spoken with actual malice, with at least reckless disregard of the falsity of the defamatory content of that statement.

2. The aforesaid defamatory statement by the defendant constituted slander per se, in that it imputed (1) criminal conduct to the plaintiff, including but not limited to cheating, false pretenses and receiving stolen property and (2) conduct that was not compatible with the proper conduct of the plaintiff's business.

3. Further, it has been established by clear and convincing proof that the statement by the plaintiff that the defendant cheated Juan Barcinas out of land constituted slander per se, in that it imputed criminal conduct to the defendant, including cheating and false pretenses, was published to third persons and spoken with actual malice, with at least reckless disregard of the falsity of the defamatory content of that statement: The statement also would have tended to affect the defendant's good reputation in the community, and to cause the members of that community to hold him in contempt and to shun him.

THEREFORE, Judgment will be entered as follows:

1.  The plaintiff shall be awarded as and for

    General damages $1,000.00

    Punitive damages $10,000.00

2.  The defendant-counterclaimant shall be awarded, as and for

    General damages $1,000.00

    Punitive damages $10,000.00

3.  Each party shall bear his own costs of suit.

DATED: Saipan, Northern Mariana Islands this 23rd day of MAY, 1980.

_____

ALFRED LAURETA
Judge of the above-entitled Court